Filed 7/6/16  P. v. Wisehart CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B263074 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA080656) |
| v. | |
| DANIEL B. WISEHART, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Corey J. Robins, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant and appellant Daniel B. Wisehart (defendant) was convicted of ten counts of committing lewd acts upon a child (Pen. Code, § 288, subd. (a)[1]); three counts of aggravated sexual assault of a child by rape (§ 269, subd. (a)(1)); two counts of aggravated sexual assault of a child by penetration rape (§ 269, subd. (a)(5)); one count of aggravated sexual assault of a child by sodomy (§ 269, subd. (a)(3)); and three counts of aggravated sexual assault of a child by oral copulation (§ 269, subd. (a)(4)). On appeal, defendant contends the trial court erred in denying his *Marsden*[2] motion because an "irreconcilable conflict" existed between him and his trial counsel such that inadequate representation was likely to result; the trial court improperly denied his *Faretta*[3] motion; the trial court erred in admitting evidence under Evidence Code section 1108 concerning his molestation of another minor, thus violating his right to due process; his sentence constitutes cruel and unusual punishment under the United States and California Constitutions; and he is entitled to reversal because of cumulative error. We affirm the judgment.

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

[2]     *People v. Marsden* (1970) 2 Cal.3d 118.

[3]     *Faretta v. California* (1975) 422 U.S. 806.

# BACKGROUND

### A.      Factual Background

#### 1.      *Defendant's Sexual Abuse of P.W.*

Defendant and Analiza Roy were married and had a child, P.W., in May 1998. Defendant and Roy divorced when P.W. was 11 years old, and thereafter defendant and Roy shared custody of P.W.

In 2010, when P.W. was 12 years old, Roy went to Germany for the summer. P.W. therefore stayed with defendant in his mobile home. In late June or early July 2010, P.W. learned of the word "prostitution" and asked defendant to explain its meaning to her. Defendant asked P.W. if she trusted him, and after P.W. said she did, he took her into the master bedroom, where she slept. Defendant kissed her. She found it "weird, because it wasn't like you should be kissed by your Dad." But she "trusted him"; she "figured . . . [defendant] wasn't going to do anything wrong" and that it was "okay."

Defendant spread P.W.'s legs and touched her on her genital and chest areas both under and over her clothes. While he did these things to her, he asked P.W., "Are you okay? Is this okay? Is anything wrong?" While touching P.W., defendant also said things such as, "This is how your body reacts to this." P.W. thought it "felt off," but trusted defendant and believed it felt strange because it was "new." Defendant "kind of implied" to her not to talk about the incident. Defendant would not talk about it even when it was just the two of them alone and would tell her to "stay quiet."

A couple of days later, defendant tucked P.W. into bed and kissed her good night, but the kiss was more like the way he had kissed her during the first incident. Defendant touched P.W. on the chest and genital areas both under and over her clothes, and took off both her and his clothes. Defendant opened up P.W.'s legs, got on top of her, and put his penis in her vagina and had sex. Defendant occasionally asked if she was "okay." P.W. felt nervous and scared, but did not resist because defendant "raised me to do what he

3

told me to without question. I think if I had tried [to resist], it wouldn't have made a difference." Defendant told P.W. not to tell anyone what he had done, and people would "look down on it." Similar incidents occurred about once a week throughout most of the summer.

When school resumed in the fall, P.W. stayed at defendant's home during the week and with Roy on weekends. During that time when P.W. stayed with defendant, he continued to assault her "about every three days." During one incident defendant had P.W. perform oral sex on him. He performed oral sex on P.W. "a lot," and on one occasion "anal[ly]" assaulted P.W.

Defendant had a consistent routine during each assault. Defendant always took off both his and P.W.'s clothes, and spread P.W.'s legs open. Most of the time, defendant would make P.W. lie on her back, but sometimes he made her get on "all fours" and positioned himself behind her, and sometimes he placed her on top of him. On over half of the occasions, defendant put his fingers in P.W.'s vagina as a "precursor" to sex.

Sometime before May 2011, defendant's sexual assaults on P.W. ended when P.W. told defendant to stop. Defendant unsuccessfully attempted to "talk [her] back into it." By that time, defendant had assaulted P.W. 50 or 60 times, "[m]aybe more." P.W. never consented to any of the sex acts that defendant perpetrated on her. According to P.W., "[h]e built . . . trust in me, so that he could get [what] he wanted." Defendant made P.W. feel "it was [her] fault this had happened."

Defendant instructed P.W. to say she was "discovering" herself if her doctor asked if she was sexually active, and "not to say anything about what had happened." After the incidents of sexual assault had stopped, and shortly before a physical examination by her doctor, defendant told P.W. to urinate in a cup. She later realized it was for a pregnancy test.

In about May 2014, P.W. told Roy about defendant's sexual abuse. Roy called the police.

4

## 2. *The Pretextual Telephone Call*

At the direction of a police detective, P.W. called defendant and spoke to him in a recorded conversation. The recording of that conversation was played for the jury.

During the telephone call, P.W. told defendant she was in the counselor's office at school and had "messed up" by telling the counselor about "what happened with us back when I was like in elementary school." Defendant said that she should talk to him, but that speaking on the school's phone about a confidential matter was not a "good thing."

P.W. said she thought the conversation with the counselor was confidential, but the counselor "was going to make a report." She asked defendant what she should do. He replied "basically you do nothing, you say nothing . . . . [D]on't trust any of those people whatever they are. [T]hey're . . . probably people that are going to ruin the rest of my life . . . . [¶] . . . [¶] Do not speak to anybody. . . . [¶] . . . [¶] If you're having problems, there is no one there you can trust."

The following exchange occurred: [Defendant:] Um, nothing went on . . . . [P.W.:] No, you can't just . . . [Defendant:] Okay. You're on a public phone."

P.W. said that she had been "keeping this in for four years," and it had been very hard for her. She said she had told the counselor that "we had sex," and told him "everything." She did not want defendant to go to jail. Defendant said their lives would be turned "upside down" in an investigation, P.W. needed to "be quiet," "nothing happened," and she should not be making "allegations."

Defendant said that he had done nothing to P.W., and she needed to not say anything more; if she would not listen to him, they were "done." Defendant continued that if P.W. continued to speak on the telephone instead of listening to him, his "life might end." Defendant said he did not know P.W.'s side of the story. P.W. responded, "Bullshit! You don't know my side of the story. You fucking . . . you had sex with me!" Defendant responded, "[I]f that's the way it's gonna be" and "if you got issues," "take it to police [and] put me away."

5

Defendant asked P.W. if she wanted him to apologize, but she responded that she did not want him to apologize. Instead, she wanted to know why he did those things to her, and what she should do in response to the counselor's investigation. Defendant said in response, "Okay here. Here's what it is. You, [o]kay, you approached me and asked me to teach you things your mom would not teach you. [¶] . . . [¶] Okay, you asked me for a basic education and I did nothing else but give you what you asked for."

Defendant told P.W. to stop talking about their past because otherwise he would go to jail and "basically be a piece of shit the rest of [his] life afterwards." But if she stopped talking, then "maybe something . . . good will come out of your life and mine." Defendant continued, "[The counselors] are not there to help you. They are a business like anything else. They are there to feed their own."

Defendant told P.W., "So this is how it works [P.W.]. If you will be quiet and say nothing, they will do nothing. If you speak, my life is over and I explained that to you when you asked me to teach you things." P.W. said, "I asked you [to] talk to me about it. I didn't ask you to actually have sex with me." Defendant responded, "I won't say it again. Be quiet. Say nothing." Defendant told P.W. he would talk to her about "it," "but [they were] on a public phone."

P.W. said she would not say anything more and asked defendant to promise her that it would never happen again, to her or anyone else. Defendant responded, "[P.W.], I promise you that nothing like that has ever happened with anybody except what you asked me for and you told me . . . ."

P.W. told defendant she wanted him to be honest with her, and if he would not, she would tell the police everything. She also said she was not a virgin because of defendant. Defendant responded, "There's obviously a lot about sex you don't know yet," and "the ball's in your court."

### 3. *Defendant's Prior Act of Sexual Abuse of a Child*

D.G. was related to defendant, her "grandfather's wife's son." Defendant was her "step-uncle," and she had known him her whole life—27 years. Until D.G. was six years

6

old, she lived with defendant, and her parents, brother, and grandparents. When D.G. was about three or four years old, defendant touched D.G.'s breasts and genitals both under and over her clothing. Defendant molested D.G. several times a week for about one year. He always did it in the same way. Defendant would always place D.G. on his lap, fondle her both under and over her clothing, and place his fingers inside of her vagina. While molesting D.G., defendant would say things like, "It's okay. You're beautiful," and other "different things." D.G. was scared; she did not know what defendant was doing or why.

D.G. and her family moved to Oregon. When D.G. was about nine or 10 years old, she visited her grandfather in Washington; defendant also visited him. Defendant would enter the bathroom when D.G. was there, and touch her "private area." Defendant would "[l]ay on top and like move." Defendant touched D.G. both under and over her clothing, touched her "vaginal area," and inserted his finger into her vagina.

In one of the bedrooms, defendant would make D.G. lay or sit down on the bed, and he touched her "vaginal area," and inserted his fingers into her vagina. He would say, "It's okay. You're beautiful," and touch D.G.'s hair.

On one occasion during defendant's visit, he and Roy (who was defendant's wife at the time) took D.G. to Seattle for a one-day trip. Defendant discretely fondled D.G. by touching her, caressing her, and putting his arm around her. That was the last time defendant fondled her.

D.G. did not tell anyone what defendant did to her because she "didn't know any better" and was afraid she might get into trouble. When D.G. was 12 years old, she finally told her mother about defendant's conduct.

### 4.    *Child Sexual Abuse Accommodation Syndrome*

The prosecutor's child sexual abuse expert testified about "child sexual abuse accommodation syndrome." She explained that generally, without "support," child abuse victims often never disclosed the abuse or delayed disclosure. Children often endure sexual abuse silently because they feel shame and helpless when the perpetrator had

ongoing access and a close relationship to them. There were many different motivating factors for child-abuse victims not to disclose the abuse, even years later.

### 5. *Defendant's Case*

Defendant did not testify and presented no evidence on his behalf.

### B. Procedural Background

The District Attorney of Los Angeles County filed an amended information charging defendant with ten counts of committing lewd acts upon a child in violation of section 288, subdivision (a) (counts 1, and 40-48), three counts of aggravated sexual assault of a child by rape in violation of section 269, subdivision (a)(1) (counts 2, 4, and 6), two counts of aggravated sexual assault of a child by penetration rape in violation of section 269, subdivision (a)(5) (counts 3 and 5), one count of aggravated sexual assault of a child by sodomy in violation of section 269, subdivision (a)(3) (count 26), and three counts of aggravated sexual assault of a child by oral copulation in violation of section 269, subdivision (a)(4) (counts 28-30).

Defendant pleaded not guilty as to all counts. The trial court denied defendant's *Marsden* and *Faretta* motions. After the People began presenting their case-in-chief, defendant withdrew his not guilty pleas to counts 40 and 46, and entered guilty pleas, though the jury was not informed of the pleas. Following a full trial, the jury found defendant guilty on the remaining counts.

The trial court sentenced defendant to state prison for a term of 143 years to life. The trial court awarded defendant 368 days of custody credit consisting of 320 days of actual custody credit and 48 days of conduct credit. Defendant filed a timely notice of appeal.

### DISCUSSION

### A. *Marsden* Motion

Defendant contends that the trial court abused its discretion in denying his motion made pursuant to *People v. Marsden*, *supra*, 2 Cal.3d 118.  We disagree.

### 1.     *Standard of Review*

We review a trial court's decision to deny a *Marsden* motion under the deferential abuse of discretion standard.  (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)  "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' [Citation.]"  (*Ibid.*; *People v. Panah* (2005) 35 Cal.4th 395, 431.)

### 2.     *Applicable Law*

A defendant who believes that his appointed counsel is providing ineffective assistance may seek to have that counsel relieved and substitute counsel appointed through "what is commonly called a *Marsden* motion."  (*People v. Smith* (2003) 30 Cal.4th 581, 604.)  To prevail, the defendant must make "'"a substantial showing"'" that denial of his *Marsden* motion is likely to result in "'"constitutionally inadequate representation."'"  (*People v. Streeter* (2012) 54 Cal.4th 205, 230 (*Streeter*).)  Our Supreme Court stated, "A defendant must make a sufficient showing that denial of substitution would substantially impair his constitutional right to the assistance of counsel [citation], whether because of his attorney's incompetence or lack of diligence [citations], or because of an irreconcilable conflict [citations].  We require such proof because a defendant's right to appointed counsel does not include the right to demand appointment of more than one counsel, and because the matter is generally within the discretion of the trial court.  [Citation]"  (*People v. Ortiz* (1990) 51 Cal.3d 975, 980, fn.1.)

A trial court does not err in denying a *Marsden* motion based on a defendant's complaints of his counsel's inadequacy amounting to tactical decisions.  (*People v. Dickey* (2005) 35 Cal.4th 884, 922.)  "'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few

fundamental decisions for the defendant.'  [Citation.]"  (*People v. Welch* (1999) 20 Cal.4th 701, 729.)

>    *3.*    *Facts*

On November 20, 2014, at the preliminary hearing, defendant was represented by deputy public defender Michael Tanner.  On February 5, 2015, at defendant's request, the trial court held a *Marsden* hearing.

During the in camera hearing, defendant stated, "Over the past eight months, Mr. Tanner has repeatedly and indeed consistently demonstrated himself to be not only incompetent, but also unprofessional, unwilling to listen, unwilling to challenge the [District Attorney's] errors, unable to follow through with anything he and I have discussed, unwilling to put forth any efforts to prepare any defense, [is] untruthful.  And he has blatantly, grotesquely misquoted and misrepresented me in open court."  Defendant stated that his list of specific "grievances against Mr. Tanner . . . [is] sufficient to [conclude] without doubt that Mr. Tanner's performance . . . is far below reasonable, objective standards.

Specifically, defendant said his "grievances" against Tanner were that Tanner visited him on only two brief occasions during defendant's nine months of incarceration; Tanner was not concerned with defendant's civil rights; Tanner did not successfully contact a private attorney defendant asked him to contact; despite defendant's repeated requests, Tanner did not contact the individuals who had the "legal power of attorney" to liquidate defendant's assets; Tanner did not fulfill his promises to visit defendant in prison prior to defendant's court proceedings; defendant had five meetings with Tanner prior to the court proceedings that were "exceedingly brief," and Tanner failed to spend adequate time with defendant after the court proceedings, as promised; Tanner failed to ask questions at the preliminary hearing that defendant wanted asked; Tanner ignored defendant; Tanner failed to object to certain evidence at the preliminary hearing; in response to the prosecutor's offer of a determinate sentence, Tanner  "suggest[ed] to the

court that defendant wanted to "enjoy life," falsely implying, according to defendant, that defendant had a "careless and selfish nature"; Tanner did not listen to defendant; to defendant's knowledge, Tanner did not interview people who could assist in defendant's defense; Tanner did not keep defendant apprised of the status of his defense; and Tanner was otherwise unprepared and incompetent.

Tanner stated he attempted to interview numerous witnesses, including those named by defendant, but the witnesses were uncooperative; when he began representing defendant, he met with defendant while incarcerated and explained the charges; as a public defender, he was not allowed to "do anything with respect to" defendant's assets; defendant "sometimes like[d] to talk more than he listen[ed]"; he had "done everything [defendant] asked [him] to do"; he sent a letter to defendant's father; and he believed defendant misunderstood their conversation about what questions Tanner would ask at the preliminary hearing and trial. Tanner said, "This case, in terms of preparing, is a very simple case in the sense that there is a single accuser. . . . There is no physical evidence. . . . [B]asically, it's a he said/she said type of evidentiary case. . . . [¶] . . . [¶] The case is not complicated. And we've discussed strategy. We've discussed whether or not he'll testify, [and] the consequences of testifying or not testifying. We've discussed whether or not to seek an offer from the District Attorney."

In response, defendant stated, "I disagree with things Mr. Tanner has said, but my disagreements have already been presented." The trial court ruled: "The *Marsden* motion is denied. I find that Mr. Tanner is appropriately representing the defendant."

Immediately after the in camera hearing, defendant stated that he wanted another *Marsden* hearing so that he could address Tanner's rebuttal to defendant's *Marsden* claims. The trial court stated it had provided defendant about 20 minutes to present his reasons for replacing Tanner, and denied defendant's request. The trial court stated that defendant could raise the matter in the future if he had new information to present. On March 5, 2015, jury selection began, and the next day, opening statements were made.

### 4. *Analysis*

11

Defendant failed to show that the trial court's denial of his *Marsden* motion was an abuse of discretion as he did not make a """"substantial showing"""" that the trial court's denial of his *Marsden* motion was likely to result in constitutionally inadequate representation.  (*Streeter*, *supra*, 54 Cal.4th at p. 230.)

On appeal, defendant does not challenge the trial court's finding that Tanner was appropriately representing defendant.  Instead, defendant argues an "irreconcilable conflict" existed between him and Tanner such that inadequate representation was likely to result.  However, defendant did not base his *Marsden* motion on an irreconcilable conflict.  Indeed, even when the trial court concluded "Tanner [was] appropriately representing the defendant," defendant did not object to the finding by stating an irreconcilable conflict existed between him and Tanner, or that their relationship had completely broken down, such that inadequate representation was likely to result.  He therefore forfeited this claim for appellate review.  (*Streeter*, *supra*, 54 Cal.4th at p. 230.)


### B.      *Faretta* **Motion**

Defendant contends that the trial court improperly denied his *Faretta* motion.  The trial court properly denied the motion.


### 1.      *Standard of Review and Applicable Law*

"'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive.  A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution.  [Citations.]  At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself.  [Citation.]'  [Citation.]"  (*People v. James* (2011) 202 Cal.App.4th 323, 328-329.)

"A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently.

12

[Citations.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*).) "*Faretta* motions must be both timely and unequivocal.  Otherwise, defendants could plant reversible error in the record.  [Citations.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002.)

A request made pursuant to *Faretta*, *supra*, 422 U.S. 806 is not equivocal merely because a defendant requests that his or her counsel be removed and, if not removed, that the defendant wants to represent himself or herself.  (*People v. Michaels* (2002) 28 Cal.4th 486, 524.)  The *Faretta* motion is equivocal, however, if it is made because the defendant wanted to rid himself of appointed counsel.  (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1205 (*Scott*).)

Our Supreme Court stated that a *Faretta* motion also is equivocal, "'even if the defendant has said he or she seeks self-representation,'" if it is "'made out of a temporary whim, or out of annoyance or frustration.'" (*People v. Stanley* (2006) 39 Cal.4th 913, 932-933.)  Courts must 'indulge every reasonable inference against waiver of the right to counsel.' [Citation.]" (*Id.* at p. 933.)

Furthermore, the California Supreme court has "long held that a self-representation motion may be denied if untimely.  [Citation.]" (*Lynch*, *supra*, 50 Cal.4th at p. 722.)  "In order to invoke the constitutionally mandated unconditional right of self-representation, a defendant must assert that right within a reasonable time prior to trial. The latter requirement serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice.  [Citation.]  If the motion is untimely—i.e., not asserted within a reasonable time prior to trial—the defendant has the burden of justifying the delay.  [Citation.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1110; *People v. Hill* (1983) 148 Cal.App.3d 744, 757 ["'it is now settled that a trial court may deny a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation'"].)  Although a trial court has no discretion to deny a valid, timely *Faretta* motion (*Lynch*, *supra*, 50 Cal.4th at p. 726), a *Faretta* motion that is untimely—that is, not made within a reasonable time prior to trial—is addressed to the sound discretion of the trial court. (*People v. Marshall* (1996) 13 Cal.4th 799, 827.)

13

## 2. Facts

As noted above, immediately after the in-camera hearing on defendant's *Marsden* motion, defendant requested another *Marsden* hearing. The trial court denied defendant's request.

The trial court stated they were at "day zero of 30," and asked if trial counsel was ready for trial.[4] Tanner responded affirmatively. Defendant interjected, "No." The trial court reminded defendant he was represented by counsel, who was to answer that question. The trial court set the matter for trial for February 24, 2015; day "19 of 30."

Defendant then requested self-representation status, and the following exchange occurred: "The Defendant: I am not prepared. I don't even know the charges against me, Your Honor. [¶] The Court: Are you ready to proceed by the 30 days from now? [¶] The Defendant: I have no preparation yet and, I require time. I have not seen the charges against me. I've only been told of a couple of different number of charges. It has changed. I know nothing of the case against me, and I need time to prepare."

The trial court denied defendant's self-representation request stating, "At this point, the motion is denied for the following reason: first of all, it's not timely. The defense is ready to go within the period. Correct? Mr. Tanner is ready, based on what he said earlier. . . . [¶] So it's not timely. The *Faretta*, oral *Faretta* is denied. It's not timely. And also, it appears to the court it is in response to the court's denial of the *Marsden*. [¶] . . . [¶] [A]s I said, the first ground is, it's not timely. The defendant said he's not ready to proceed within the period. [¶] The oral motion to proceed *pro per* is denied for the reasons I've indicated. It's not timely, and it's in response to the court's denial of the *Marsden* motion."

## 3. Analysis

---

**4** A criminal defendant has a right to a speedy trial. (§ 686.)

14

Defendant's request to represent himself was equivocal because the record suggests that he made his *Faretta* motion because he wanted to free himself of his counsel. This is insufficient under *Scott*, *supra*, 91 Cal.App.4th 1197. In *Scott*, the court affirmed the trial court's denial of the defendant's motion for self-representation under *Faretta*, *supra*, 422 U.S. 806 stating "the motion was not unequivocal. [The defendant] made his *Faretta* motion immediately after the trial court denied his *Marsden* motion, and [the defendant's] subsequent comments suggest he made the *Faretta* motion only because he wanted to rid himself of appointed counsel." (*Scott*, *supra*, 91 Cal.App.4th at p. 1205, fn. omitted.) Here, it is reasonable to infer that defendant was frustrated having his *Marsden* motion denied. Unrelenting, defendant immediately requested another *Marsden* hearing, which the trial court denied. Then, after defendant's attorney said he was ready for trial, defendant interjected that he was not ready, and made a request for self-representation while acknowledging he was unprepared for trial in 30 days. The trial court properly found defendant's *Faretta* request to have been made in response to its denial of his *Marsden* motion.

In addition, defendant's *Faretta* request was untimely. Tanner began representing defendant no later than at the November 20, 2014, preliminary hearing. Defendant did not make his *Faretta* request until about two and one-half months later, on February 5, 2015—"day zero of 30" for trial. Defendant therefore had ample time in advance to request self-representation status, yet did not do so until the case was within 30 days of trial.

Defendant explained that he would not be ready for trial in 30 days, and he did not even know what the current charges were against him. Tanner advised the trial court that he would be ready for trial. The trial court properly exercised its discretion and denied defendant's *Faretta* motion on the basis it was untimely. Because defendant's *Faretta* request was equivocal, untimely, and would have required an indefinite continuance, the trial court properly denied it.

**C.   Admission of Evidence**

Defendant contends that the trial court erred in admitted evidence under Evidence Code section 1108 concerning his molestation of D.G., violating his right to due process. The trial court did not err.

*1.   Standard of Review*

We review for an abuse of discretion the trial court's rulings on the admissibility of evidence. (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)

*2.   Applicable Law*

Evidence code section 1101, subdivision (a), provides: "Except as provided in this section and in Section[] 1108 . . . evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." However, "When a defendant is accused of a sex offense, Evidence Code section 1108 permits the court to admit evidence of the defendant's commission of other sex offenses, thus allowing the jury to learn of the defendant's possible disposition to commit sex crimes. [Citation.] The court has discretion under Evidence Code section 352 to exclude the evidence . . . ." (*People v. Cordova, supra,* 62 Cal.4th at p. 132.) "[E]vidence of a 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282-283.)

Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352, provides that evidence is not admissible if "its probative value is

16

substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

### 3. Facts

During her opening statement, the prosecutor told the jury they would hear from D.G. about defendant's prior molestations of her as a child. During defendant's opening statement, defendant's counsel conceded defendant had sex with P.W., but asserted that did not mean he was guilty of each count as charged.[5]

Defendant's counsel then "renewed"[6] his objection to the prosecutor presenting any testimony by D.G. (regarding defendant's prior molestations of her) pursuant to Evidence Code section 1108, because he "did not believe it's necessarily relevant . . . for two reasons:" (1) defendant's conduct regarding D.G. was "miniscule" compared to that alleged in the instant case, and (2) defendant's counsel "dispelled the need to show any propensity" by the concessions made in the opening statement. Defendant's counsel continued, "So what's that witness going to do, but unduly prejudice my client, take up extra time and add nothing to the case." The prosecutor responded by arguing, inter alia,

---

[5] Defendant's theory at trial was that he was guilty of the counts charging him with committing lewd acts upon a child (§ 288), but the sexual encounters with P.W. were consensual (i.e., not coerced) and therefore he was not guilty of the aggravated sexual assault charges (§§ 261, 269). For instance, defendant's counsel argued in closing argument that, "This is a classic example of a [section] 288 lewd conduct with a minor [case] and prosecutorial overreaching. [¶] . . . [¶] [J]ust because you find that one count or two counts or three counts or whatever has been proved beyond a reasonable doubt, it doesn't mean that they all were. [¶] We are here, simply because of prosecutorial overreaching, trying to twist the consensual conduct, if you call it that. [¶] . . . [¶] [C]onsent is not a defense to [a section] 288 [offense]. . . . But it is a defense to aggravated sexual assault."

[6] The record on appeal does not reflect any proceedings during which defendant's counsel made the original objection. Defendant states "the original objection was made in an unreported conference."

that it was "still relevant," D.G. was a "completely allowable witness" under Evidence Code section 1108, and it was "not a waste of time."

The trial court overruled defendant's objection, stating, "My ruling has not changed. Opening statements are not evidence. And it does appear that based on the opening statements that credibility of the complainant is at issue. And I'm going to allow propensity evidence. The confession in the opening statement, that something happened, does not change the court's conclusion. That is not evidence. And the People still have the right to present the evidence. And my [Evidence Code section] 352 weighing has not changed, so the ruling has not changed."

Later during the trial, after defendant withdrew his not guilty pleas to counts 40 and 46, and entered guilty pleas, defendant's counsel asked the trial court to "reconsider under [Evidence Code section] 352" its prior ruling on the Evidence Code section "1108 evidence" because it was irrelevant. The trial court ruled that the People could not present evidence of the guilty pleas on counts 40 and 46 to the jury, and thus, its ruling on the D.G. testimony would stand.

### 4. Analysis

Although admitting that an objection under Evidence Code section 352 preserves a subsequent due process claim on appeal,[7] the Attorney General contends that defendant forfeited his claim that the trial court's admission of the evidence violated his right to due process. The Attorney General argues that (1) the record discloses that defendant objected to the proposed evidence only on relevance grounds; and (2) even though there

---

[7] *People v. Perry* (2006) 38 Cal.4th 302, 317, fn. 6 [although the defendant did not raise constitutional objections to the admission of evidence, "his objection that the admission of [the evidence] would violate section 352 of the Evidence Code because the evidence was more prejudicial than probative preserves the constitutional issue whether, for the same reason, the admission of [the evidence] violated due process"]; *People v. Partida* (2005) 37 Cal.4th 428, 438 ["[the] defendant may argue [on appeal] an additional legal consequence of the asserted error in overruling the Evidence Code section 352 objection is a violation of due process"].

18

was a reference to a prior Evidence Code section 352 objection by defendant, the record is inadequate because that objection is not in the record.

The record is sufficient to show that defendant objected to the proposed evidence under Evidence Code section 352. As noted above, that section provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice . . . ."

Counsel for defendant stated in his "renewed" objection following opening statement that D.G.'s proposed testimony was not "relevant"—"add[s] nothing to the case" (i.e., has no "probative value"), and the admission of that evidence would "take up extra time" (i.e., "necessitate undue consumption of time") and "unduly prejudice" defendant (i.e., "create substantial danger of undue prejudice"). Later, defendant's counsel asked the trial court to reconsider "under [Evidence Code section] 352" it's prior ruling regarding D.G.'s proposed testimony because it was irrelevant.

It is of no consequence that defendant's original Evidence Code section 352 objection is not in the record. Defendant is not challenging the trial court's ruling on this counsel's "original objection" purportedly made in an unreported conference. Defendant counsel's "renew[al]" and "reconsider[ation] of that objection, particularly with specific references to the statute, is in the record and serves as an independent bases upon which to complain of trial court error.

On its merits, however, defendant's argument fails. As defendant concedes, the California Supreme Court held that Evidence Code section 1108 does not violate California or federal due process principles. (*People v. Loy* (2011) 52 Cal.4th 46, 60-61; *People v. Wilson* (2008) 44 Cal.4th 758, 797; *People v. Falsetta* (1990) 21 Cal.4th 903, 916.) The trial court properly exercised its discretion in admitting evidence of defendant's repeated sexual abuse of D.G. to prove defendant's propensity to commit such acts, particularly where defendant was advancing a consent defense yet the evidence showed he molested D.G. even though she was scared. The D.G. evidence was highly probative of defendant's propensity to sexually assault children related to him and to

19

whom he had some form of private access, and over whom he was an authority figure, over a lengthy period of years.  The evidence showed that defendant molested D.G., his relative, while she was a young child, several times a week for around one year.  The circumstances of his abuse of P.W., his biological daughter, were similar, in that both victims were children living with defendant where he was an authority figure.  The trial court properly exercised its discretion in finding the evidence relevant under Evidence Code section 1108 because it demonstrated defendant's propensity to commit the crime.

Admission of the evidence was not unfairly prejudicial.  P.W. testified that defendant penetrated her anally and vaginally, made her perform oral sex upon him and he did so upon her.  In contrast, defendant's molestations of D.G. did not appear to involve oral, vaginal, or anal intercourse, but some lesser forms of child molestation.  Defendant conceded below that the D.G. evidence described sexual crimes that were "miniscule" compared to the crimes alleged in the instant case.  The D.G. evidence was damaging to defendant in that it was highly relevant and showed defendant's propensity to sexually abuse young children living with him, but it was not unfairly prejudicial.

### D.     Cruel and Unusual

Defendant contends that his sentence of 143 years constitutes cruel and unusual punishment under the under the United States and California Constitutions.  We disagree.

### 1.     Applicable Law

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.  The Eighth Amendment does not require strict proportionality between the crime and sentence; rather, it forbids sentences that are grossly disproportionate to the severity of the crime.  (*Ewing v. California* (2003) 538 U.S. 11, 23-24 (*Ewing*); see *In re Coley* (2012) 55 Cal.4th 524, 529.)  Three factors are considered:  the gravity of the offense and the harshness of the penalty; sentences imposed on other criminals in the same jurisdiction; and sentences imposed for the same

crime in other jurisdictions. (*Ewing*, *supra*, 538 U.S. at p. 22; *In re Coley*, *supra*, 55 Cal.4th at p. 540.)

A sentence may be cruel or unusual under the California Constitution, article I, section 17. Such a sentence though must be so disproportionate to the crime that it shocks the conscience and offends fundamental notions of human dignity. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1287-1288; *In re Lynch* (1972) 8 Cal.3d 410, 424, superseded on other grounds as stated in *People v. Caddick* (1984) 160 Cal.App.3d 46, 51, 52.) "We analyze three criteria to determine whether a sentence is 'cruel or unusual' under article 1, section 17 of the Constitution of California: the nature of the offense and the offender (with particular attention to the degree of danger both present to society); a comparison of the sentence with those for other more serious offenses under California law; and a comparison of the sentence with those in other states for the same offense. [Citation.]" (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 (*Retanan*).)

Because choosing appropriate criminal penalties is a legislative function, a court must not intervene unless the prescribed punishment is out of proportion to the crime. (*Ibid.*; *People v. Felix* (2003) 108 Cal.App.4th 994, 999-1000.) Successful challenges to the proportionality of particular sentences have been very rare. (*Ewing, supra,* 538 U.S. 11, 21 ["'outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare'"]; *Rummel v. Estelle* (1980) 445 U.S. 263, 272 [same]; *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 ["Findings of disproportionality have occurred with exquisite rarity in the case law"].)

### 2. Facts

Over defendant's Eighth Amendment objection of cruel and unusual punishment, and "any other state constitutional grounds that are equivalent," the trial court sentenced defendant on count 1 to the high term of eight years, and to consecutive terms of 15 years to life each of 2 through 6, 26, and 28 through 30—i.e., to 143 years to life. Punishment on the remaining counts was imposed consecutively, and stayed under section 654.

21

*3.    Analysis*

In contending his sentence is cruel and unusual punishment in violation of the United States and California Constitutions, defendant does not argue the specific factors set forth above referred to in *Ewing*, *supra*, 538 U.S. at page 22; *In re Coley*, *supra*, 55 Cal.4th at page 540; *Retanan, supra,* 154 Cal.App.4th 1219 at page 1231. Instead he refers to Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585 at pages 600 through 602 (*Deloza*), which argued that a sentence which exceeded the human life span was cruel and unusual.

In *Retanan*, *supra*, 154 Cal.App.4th 1219, the defendant was convicted of multiple counts of sexually abusing four different children, and sentenced to 135 years to life. The court of appeal rejected his claim that the sentence was cruel and unusual punishment under the federal and state constitutions on the basis that "he cannot possibly serve the imposed sentence." (*Id*. at p. 1231.) The court found the defendant implicitly conceded his sentence was not unconstitutional because he made no effort to compare his offense with more serious offenses in California or with punishments in other states for the same offense; and because he relied solely on the concurrence written by Justice Mosk in *Deloza*, *supra*, 18 Cal.4th 585, the defendant's claim was unsupported by precedent. (*Ibid*.) The court held the defendant's sentence of 135 years to life was not disproportionate to the crime. (*Ibid*.) Defendant's claim here similarly fails.

## E.    Cumulative Impact

Defendant contends he is entitled to reversal because of cumulative error. We find no prejudicial legal error. Therefore, we reject defendant's argument that the cumulative effect of all the errors requires reversal. (*People v. Jones* (2013) 57 Cal.4th 899, 981; *People v. Edwards* (2013) 57 Cal.4th 658, 746.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

RAPHAEL, J.*

We concur:

KRIEGLER, Acting P.J.

BAKER, J.

_____

* Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.